# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
                                                       ) Case No.
One Samsung cellular telephone model SPH-M840, )
    DEC 268 435 462 906 518 407, )
       HEX A00 000 456 376 87 )

3:18sw3

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the     Eastern     District of     Virginia    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
    ☑ evidence of a crime;
    ☐ contraband, fruits of crime, or other items illegally possessed;
    ☐ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1961 | Racketeer Influenced and Corrupt Organizations Act (RICO) |
| 18 U.S.C. § 1962 | RICO Conspiracy |
| 18 U.S.C. § 1959 | Violent Crimes in Aid of Racketeering |

The application is based on these facts:
See attached affidavit of FBI Special Agent, pages 1-13.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent Michael K. Termyn
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 12, 2018

/S/
David J. Novak
United States Magistrate Judge

City and state: Richmond, Virginia

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>One Samsung cellular telephone model SPH-M840, DEC 268 435 462 906 518 407, HEX A00 000 456 376 87<br><br>CURRENTLY LOCATED AT THE FBI RICHMOND FIELD OFFICE - 1970 East Parham Road, Richmond, VA 23228 | Case No. 3:18sw3 |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Special Agent Michael K. Termyn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — one cellular telephone device — which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. Your affiant is a Special Agent with the Federal Bureau of Investigation (FBI) and has been so employed since March 2008. Your affiant has been assigned to the Richmond Field Office since August 2008, working primarily violent criminal matters, to include

aggravated assaults, commercial robberies, bank robberies, violent criminal enterprises, fugitives, drug trafficking, kidnappings, and homicides. In conducting these investigations, your affiant has used a variety of investigative techniques and resources, which include, but are not limited to, conducting physical and electronic surveillance; obtaining and monitoring court-authorized wiretaps; managing the use of cooperating sources, informants, and witnesses; and executing federal search and arrest warrants. Pursuant to these investigations, your affiant has authored and executed criminal search warrants on electronic devices, including traditional cellular phones, smart phones, computers, and other forms of digital storage media. Through these investigations, training and experience, and conversations with other agents and law enforcement personnel, your affiant has become familiar with the methods used by violent offenders to conduct their illegal activities, to include their communication methods.

## BACKGROUND OF INVESTIGATION

3. The requested warrant is sought in connection with an investigation by the Richmond Police Department (RPD), Department of Homeland Security (DHS), and the FBI into the violent street gang La Mara Salvatrucha, commonly referred to as MS-13, operating in the Richmond metro area. MS-13 is a well-documented transnational violent street gang. The MS-13 gang and associates are believed to have committed, and continue to commit, violations of federal criminal statues, including 18 U.S.C. § 1961 (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. § 1962 (RICO Conspiracy), and 18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering).

4. As a result of my training and experience, I have the following knowledge concerning MS-13, including their means and methods:

a. MS-13 members keep photographs, often taken with and stored on cellular telephones, in which are depicted: (1) fellow gang members posing and giving hand gang signs that indicate gang identity or affiliation; (2) gang members or associates posing with weapons that are often used for criminal activities; and (3) gang members or associates posing at locations that are known to be specific gang hangouts.

b. MS-13 members will often record videos and/or take photographs of themselves committing criminal acts, discussing criminal acts, and making threats against rival gang members. These videos are often taken with and recorded on cellular telephones. On occasion, gang members send these videos, often via cellular telephones, to other gang members in the United States and El Salvador to report the crimes they committed with the hope of gaining rank in the gang.

c. MS-13 members often communicate through social media, including Facebook, Instagram, and Snapchat. The gang also uses social media to communicate to rival gang members and sometimes to lure them to locations were the gang can assault the rival gang members. Often, these social media platforms are accessed through the use of cellular telephones.

d. Members of MS-13 and their associates use intimidation, threats of violence, and violence, including murder and assault, to preserve, protect, and expand the enterprise's territory and activities and to promote and enhance the gang's prestige, reputation and position in the community.

e. MS-13 is a transnational gang with a large presence throughout the United States. The gang is divided into sub-sets called "cliques" and each clique has a hierarchy.

The clique leader is sometimes referred to as the "First Word" and the second in command is sometime referred to as the "Second Word." These leaders are responsible for the day-to-day operations of the clique and reporting the activities of the clique to gang leaders, sometimes in El Salvador. MS-13 members often use cellular telephones to report these activities.

f. Members of MS-13 and their associates promote a climate of fear through intimidation, violence, and threats of violence.

g. Members of MS-13 and their associates use intimidation, threats of violence, and violence, including murder and assault, against various individuals, including known and suspected members of rival gangs.

h. Members of MS-13 use telephones to discuss gang-related business, within the local clique and with El Salvador, and to obtain approval for the use of violence in furtherance of the purposes of MS-13 from El Salvador. Further, MS-13 members maintain telephone contact lists of other gang members. These lists often include a gang member's nickname.

5. MS-13 is a nationally known, organized street gang that originated in the Los Angeles area in the 1980s. Since then, the gang has spread to other areas of the United States, including the greater Richmond area. The existence and structure of MS-13 is well documented by law enforcement agencies nationally, and the organization has been the subject of multiple prosecutions for federal racketeering violations, including for drugs and violence.

6. To date, several MS-13 members and associates have been identified in the Richmond metropolitan area. This organization has a presence in multiple other states, including Maryland, Washington, D.C., and North Carolina, and operates from Virginia across state lines,

including using interstate communication facilities to conduct gang business, enforce gang discipline, and recruit gang members.

7. Your affiant, along with agents of the other law enforcement agencies listed above, are investigating numerous MS-13 members and associates, including DARWIN ALEXANDER SOLORZANO-QUINTANILLA, a/k/a "LITTLE GANGSTER ("QUINTANILLA"). As part of this investigation, your affiant and others interviewed an incarcerated individual associated with the MS-13 Richmond clique and who, at one time, lived in the same apartment complex as QUINTANILLA and several other MS-13 members (hereinafter CW-1). This individual previously admitted his/her involvement in several larcenies in the Commonwealth of Virginia. Additionally, this individual provided law enforcement with prior information, corroborated by law enforcement, which assisted in the arrest and conviction of several individuals for attempted robbery in Virginia. CW-1 told law enforcement that, at one point, QUINTANILLA was the leader of the Richmond-based MS-13 gang that routinely operated in La Mancha Apartments and Southwood Apartments in the south-side area of Richmond, Virginia. QUINTANILLA previously told CW-1 that prior to coming to Richmond, he (QUINTANILLA) was placed in charge of another MS-13 clique after the previous leader left the area. Further, CW-1 was present with QUINTANILLA when QUINTANILLA participated in telephone calls to MS-13 gang members located in El Salvador.

8. Based on my experience, education, conversations with other law enforcement officers, and the information described herein, there is probable cause to believe that QUINTANILLA, and other MS-13 gang members, and others yet to be identified, have been involved in a racketeering enterprise, in violation of 18 U.S.C. §1959 (b)(2) and 1961, that is, a

group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce, within the Eastern District of Virginia, and elsewhere.

9. Pursuant to 18 U.S.C. § 1961, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" and "racketeering activity" includes "any act or threat involving murder." 18 U.S.C. § 1961 (1) and (4).

10. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

11. The item to be searched is one Samsung cellular telephone, model SPH-M840, DEC 268 435 462 906 518 407, HEX A00 000 456 376 87, hereinafter referred to as the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at the FBI Richmond Field Office – 1970 East Parham Road, Richmond, VA, 23228.

12. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

13. As part of its investigation into the Richmond clique of MS-13, the United States is looking at the violent stabbing death of RAMON DELGADO-BERNAL.

14. On November 23, 2014, at approximately 6:46 p.m., RPD patrol units were dispatched to 4679 Southwood Parkway (La Mancha Apartments), Richmond, Virginia, for a report of the stabbing of a male victim. When patrol units arrived, they found DELGADO-

BERNAL suffering from what appeared to be multiple cuts and stab wounds. DELGADO-BERNAL died at the scene. He received approximately seventeen stab wounds to his body, including six in the back, seven to the head, three to the chest, and one on the wrist. The office of the Chief Medical Examiner determined DELGADO-BERNAL's manner of death was homicide and the cause of death was stab wounds to the torso.

15. DELGADO-BERNAL had several tattoos located on his body. One of the tattoos was the word "SURENO," which was located in large type on the back of his neck. The Sureños are a rival gang for MS-13. DELGADO-BERNAL also had three dots in the shape of a triangle tattooed below his eye. Although the triangular tattoo is not specific to or directly associated with a single gang, it generally means "my crazy life" ("mi vida loca" in Spanish). Prisoners and gang members relate individuals who display this tattoo to someone who has chosen to live a reckless and/or extreme lifestyle, which is synonymous with gang existence.

16. Several cooperating witnesses were identified and interviewed by law enforcement personnel. Reports from the witnesses, including CW-1, advised that DELGADO-BERNAL was a Sureño gang member and was believed to have been sent on a mission to kill a rival MS-13 gang member. FRANCISCO OVIDIO LEMUS-CASTILLO, a/k/a "LOBO," (hereinafter LEMUS) another member of MS-13, told CW-1 that DELGADO-BERNAL associated with several of the MS-13 members at La Mancha Apartments, but one of the MS-13 members questioned why the other MS-13 members were associating with DELGADO-BERNAL. A witness who was present at the apartment on the day of the homicide was subsequently interviewed by RPD detectives. The witness said QUINTANILLA and other members of MS-13 forced DELGADO-BERNAL into the corner of a room located inside 4679 Southwood Parkway, Apartment C. There, DELGADO-BERNAL was held down in a chair and

several of his personal belongings were removed. The witness further stated that he/she left the apartment because he/she knew something bad was going to happen and, shortly thereafter, saw the victim walk out of the apartment suffering from stab wounds. During the interview of CW-1 referenced in paragraph 7, CW-1 stated that after the murder LEMUS told CW-1 that several people in the room, including he (LEMUS) and QUINTANILLA, held DELGADO-BERNAL down, and stabbed DELGADO-BERNAL. QUINTANILLA and LEMUS also told CW-1 that the murder occurred because the victim was a rival gang member.

17. The MS-13 members then fled from the apartment and dispersed in different directions. DELGADO-BERNAL eventually stumbled outside and collapsed in the laundry area of the complex. No weapons were located and no law enforcement made any immediate arrests. During the processing of the crime scene, law enforcement took photographs of the apartment where the murder occurred. One of those photographs shows a table in the apartment containing MS-13 graffiti.

18. On January 8, 2015, QUINTANILLA was arrested by the RPD for First Degree Murder for the homicide of DELGADO-BERNAL. In a search incident to that arrest, police officers seized the SUBJECT DEVICE from QUINTANILLA. To date, RPD detectives have not searched the contents of the SUBJECT DEVICE and the SUBJECT DEVICE remained in the custody and control of the RPD until it was provided to the FBI on October 20, 2017, where it has remained since.

19. On January 12, 2015, LEMUS, was arrested for his participation in the murder of DELGADO-BERNAL. Detectives read LEMUS his *Miranda* rights. He agreed to speak with detectives without the presence of an attorney and provided information that he was inside the apartment when DELGADO-BERNAL was killed. LEMUS stated DELGADO-BERNAL was

arguing inside the apartment with NELSON ALEXANDER LOZANO-RAMIREZ, a/k/a "Black Clock," an additional member of MS-13. LEMUS stated at that point he went to utilize the restroom and when he came out he saw blood everywhere and everyone was fleeing the apartment. LEMUS additionally advised that DELGADO-BERNAL was in town to kill LOZANO-RAMIREZ.

20. Due to a lack of cooperation from witnesses and subjects, the Commonwealth Attorney for the City of Richmond declined prosecution in the RPD homicide investigation and the charges against QUINTANILLA, LEMUS, and LOZANO-RAMIREZ, who was also arrested for his participation in the homicide, were dismissed. Subsequently, QUINTANILLA was removed from the United States and returned to El Salvador on February 23, 2015.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

9

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine the SUBJECT DEVICE already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## SPECIFICITY OF SEARCH WARRANT RETURN AND NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

25. Consistent with the Court's current policy, the search warrant return will list the model and serial number, if known, of the SUBJECT DEVICE.

26. Moreover, the United States will file a written pleading in this case within one hundred twenty days after the execution of the search warrant notifying the court that the imaging process of digital evidence seized is complete, and the forensic analysis of the SUBJECT DEVICE has begun. Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun. Such notice to the defendant and the Court is not intended to mean, and should not be construed to mean, that the forensic analysis is complete, or that a written report detailing the results of the examination to date will be filed with the Court or provided to the defendant or his counsel. This notice does not create, and is not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of this

notice is to inform the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

## CONCLUSION

27. Based on the statements law enforcement received by the CWs, information provided by LEMUS-CASTILLO, tattoos located on DELGADO-BERNAL's body identifying him as a rival gang member, and the number of stab wounds and manner of DELGADO-BERNAL's death, your affiant believes DELGADO-BERNAL was killed by members of the Richmond based MS-13 gang primarily due to his rival gang affiliation, in violation of 18 U.S.C. § 1959

28. Based on information contained within this affidavit, your affiant believes a search of the SUBJECT DEVICE described herein will reveal that QUINTANILLA and other MS-13 gang members constituted an enterprise as defined in 18 U.S.C. § 1959, that is, a group of individuals associated in fact that engaged in and the activities of which affected, interstate and foreign commerce. Additionally, there is probable cause to believe that the SUBJECT DEVICE will contain information related to QUINTANILLA's membership in MS-13, his communication with other gang members in the United States and El Salvador, and evidence of the MS-13 enterprise. MS-13 is an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The search of the SUBJECT DEVICE will likely also reveal evidence of QUINTANILLA's and the MS-13 gang's criminal activities, criminal enterprise network, and co-conspirators yet unknown to law enforcement.

## REQUEST FOR SEALING

29. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application

and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into a criminal organization and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully Submitted,

Michael K. Termyn
Special Agent

Federal Bureau of Investigation

Subscribed and sworn to before me on
January 12, 2018.

/S/
David J. Novak
United States Magistrate Judge

**Attachment A**

Subject Device: One Samsung cellular telephone model SPH-M840, DEC 268 435 462 906 518 407, HEX A00 000 456 376 87

CURRENTLY LOCATED AT THE FBI RICHMOND FIELD OFFICE - 1970 East Parham Road, Richmond, VA 23228



**ATTACHMENT B**

**<u>LIST OF ITEMS TO BE SEIZED</u>**

1. All records on the Device described in Attachment A that relate to violations of 18 U.S.C. § 1961 (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. § 1962 (RICO Conspiracy), and 18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering) and involve Darwin Alexander Solorzano-Quintanilla a/k/a "Little Gangster" including:

   a. Any and all records and information relating to the telephone numbers and direct connect numbers or identities assigned to the device;

   b. Any and all records and information relating to the address book on the device, including, but not limited to, contact names, phones numbers, addresses, email information, and social media identifiers;

   c. Any and all records and information relating to call logs, incoming and outgoing calls, missed calls, and direct connect history information;

   d. All voice mail content;

   e. All text messages and multimedia message, whether sent, received, or in draft form;

   f. Any and all records and information relating to stored photographs and videos pertaining to the MS-13 enterprise and its members and associates; members;

   g. Any and all records and information relating to GPS location history;

   h. Any and all records and information relating to internet search history;

   i. Any and all records and information relating to the user's schedule or travel, including, but not limited to, airline, rental car, and/or hotel reservations, confirmation documentation, receipts, and payment information;

   j. Any and all bank records, checks, credit card bills, account information, and other financial records;

   k. Any and all records, information, photographs, or videos relating to violent acts or assaults;

   l. Any and all records, information, photographs, or videos relating to criminal activities in furtherance of the MS-13 enterprise;

m. Any and all photographs, or videos relating to the MS-13 enterprise;

n. Any and all records and information relating to the MS-13 enterprise, including, but not limited to, documentation relating to gang rules, gang hierarchy, member duties, meetings, locations of meetings, dues owed, dues paid, outstanding debts, membership lists, membership contact information, prospective members' contact information, and member and prospective member information, background checks, and documentation;

o. Evidence of user attribution showing who used or owned the cellular telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

p. Evidence constituting indicia of membership in the subject criminal racketeering enterprise, that is, the MS-13 enterprise.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.